## AFFIDAVIT

I, Christopher Barbadoro, having been duly sworn, state as follows:

### *INTRODUCTION AND AGENT BACKGROUND*

1. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since 2021. I am currently assigned to the Economic Crimes squad with the FBI's Boston Division. In the course of my official duties, I am charged with the investigation of violations of federal law, including money laundering, wire fraud, and bank fraud schemes. Before becoming a Special Agent, I was an Intelligence Analyst embedded on FBI New Haven's Joint Terrorism Task Force ("JTTF"). I have received specialized training in investigating financial frauds and money laundering. As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

2. I submit this affidavit in support of an application for a criminal complaint charging Loc Vo with wire fraud, in violation of 18 U.S.C. § 1343, and for a warrant to arrest him. As set forth below, there is probable cause to believe that Vo fraudulently obtained various pandemic relief loans.

3. This affidavit is based on my personal knowledge, information provided to me by other law enforcement officers and federal agents, and my review of records described herein. This affidavit is not intended to set forth all of the information that I have learned during this investigation but includes only the information necessary to establish probable cause for the requested complaint.

## *PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED*

I am aware of the following based on my training and experience and the investigation to date:

*The Paycheck Protection Program ("PPP")*

4. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or about March 2020 that was designed to provide emergency financial assistance to Americans suffering economic harm as a result of the COVID-19 pandemic. The CARES Act authorized the issuance of United States taxpayer funds in forgivable loans to small businesses, for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). The PPP permitted borrowing businesses to use loan proceeds to pay only certain expenses: payroll costs, interest on mortgages, rent, and utilities.

5. In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the applicant business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. These certifications required the applicant to affirm that "The [PPP loan] funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments," and that the "loan proceeds will be used only for business-related purposes as specified in the loan application" and consistent with the PPP rules. The authorized representative of the applicant was also required to certify that "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in material respects," and "I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."

2

6. The PPP loan application required the applicant to state, among other things, the business' average monthly payroll expenses and number of employees, which the PPP used to calculate the amount of money the small business was eligible to receive. The application also required the applicant to provide documentation showing the business' payroll expenses.

7. A participating lender approved by the Small Business Administration ("SBA") received and processed a small business' PPP loan application. If the lender approved the PPP loan application, it would fund the PPP loan using its own monies, which were guaranteed by the SBA.

*The Economic Injury Disaster Loan Program ("EIDL")*

8. The Economic Injury Disaster Loan ("EIDL") program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters. The CARES Act authorized the SBA to provide both EIDLs and $10,000 advances that did not need to be repaid to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.

9. In order to obtain an EIDL, a qualifying small business had to submit an application to the SBA that provided information about its operations, such as its number of employees, its gross revenues for the 12-month period preceding the disaster, and its cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period ran from January 31, 2019 to January 31, 2020. The applicant also had to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

10. Applicants submitted EIDL applications directly to the SBA. The SBA determined the amount of the loan, if approved, based in part on the information provided by the applicant about its employment, revenue, and costs of goods, as described above. The SBA issued EIDL

funds directly to the borrower. The EIDL funds could be used for payroll expense, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments. If the applicant also obtained a PPP loan, the EIDL proceeds could also be used for the same purpose as the PPP funds.

*Restaurant Revitalization Fund ("RRF")*

11. The American Rescue Plan Act established the Restaurant Revitalization Fund ("RRF") to provide funding to help restaurants and other eligible businesses, such as food stands, food trucks, food carts, and others, stay open during the COVID-19 pandemic. The SBA administered and funded the RRF. The RRF provided businesses with funding equal to their pandemic-related revenue loss, up to $10 million per business and more than $5 million per physical location. Recipients were not required to repay funding if the funds were used for eligible uses no later than March 11, 2023.

12. In order to apply for an RRF loan, eligible participants had to provide verification of tax information, such as an IRS Form 4506-T, as well as documentation of gross receipts, such as, among other things, business tax returns or bank statements.

13. Pursuant to the program rules, RRF loan recipients could only use the funds for the following business expenses: payroll costs, payments on any mortgage obligations, rent payments, debt service, utility payments, maintenance expense, construction of outdoor seating, supplies, food and beverage expenses, supplier costs, and operating expenses.

*The Scheme and Artifice to Defraud*

14. Beginning in or about April 2020 and continuing through in or about July 2021, in the District of Massachusetts and elsewhere, VO knowingly and with intent to defraud, devised, participated in, executed, and attempted to execute a scheme to defraud the SBA, Bank of America,

4

and others as to material matters, and to obtain money and property owned by and in the custody of and control of the SBA, Bank of America and others by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

15. As described below, VO submitted COVID-19-related loan applications to the SBA and Bank of America and certified that, among other things, he would use the funds for business purposes.

16. After receiving the funds, however, VO did not use them for business purposes. Instead, he immediately transferred the money to investment accounts in his name at E-Trade ("the E-Trade Account") or Robinhood ("the Robinhood Account") and used the funds to invest in the stock market.

17. In this fashion, VO obtained more than $1.5 million in pandemic loan proceeds that he did not use for the purposes he certified in the business' loan applications.

*EIDL Application – Smart Gourmet*

18. EIDL records indicate that on or about April 2, 2020, VO applied to the SBA for an EIDL on behalf of Smart Gourmet, LLC ("Smart Gourmet"), a food service business in Brighton, Massachusetts that VO owned and managed.

19. In the application, VO represented that Smart Gourmet's gross revenues and costs of goods sold for the twelve months prior to January 31, 2020 totaled $1,568,188 and $479,775, respectively.

20. On or about June 29, 2020, VO signed an EIDL funding agreement with the SBA. Among other things, VO agreed to "use all proceeds of this Loan solely as working capital to alleviate economic injury caused by the disaster occurring in the month of January 31, 2020."

21. On or about July 1, 2020, in reliance on VO's representations that he would use EIDL funds to alleviate disaster-related injuries, SBA wired $149,900 in EIDL funds to a business checking account at Bank of America in the name of Smart Gourmet ("the Smart Gourmet Account"), which before the wire, according to Bank of America records, had a balance of only $4,000.

22. On or about July 3, 2020, VO wired $100,000 from the Smart Gourmet Account to the E-Trade Account.

23. On or about July 6, 2020, VO wired $43,000 from the Smart Gourmet Account to the E-Trade Account.

24. On or about July 6, 2020, VO used more than $115,000 from the E-Trade Account to purchases shares in a biotechnology company.

*PPP Applications—Smart Gourmet and Indy Publish*

The First Smart Gourmet PPP Application

25. On or about April 4, 2020, VO submitted a PPP application on behalf of Smart Gourmet to Bank of America (the "Smart Gourmet PPP Application"). VO requested a $144,502 PPP loan, listing 22 employees and average monthly payroll of $57,801.

26. VO represented that the purpose of the loan was "payroll," "rent/mortgage interest," and "utilities." He certified that he would use the loan proceeds "only for business-related purposes".

27. On or about May 1, 2020, in reliance on VO's statements about what he would do with the loan proceeds, Bank of America approved and funded the Smart Gourmet PPP Application. Bank of America deposited $144,502 into the Smart Gourmet Account, which before the transaction had a balance of only $7,531.86.

6

28. On or about May 5, 2020, VO wired $100,000 from the Smart Gourmet Account to the E-Trade Account.

29. On or about May 5, 2020, VO used more than $150,000 from the E-Trade Account to purchase shares in an internet marketplace company.

30. On or about May 6, 2020, VO wired $28,000 from the Smart Gourmet Account to the E-Trade Account.

The Second Smart Gourmet PPP Application

31. On or about February 3, 2021, VO submitted a second PPP application on behalf of Smart Gourmet to Bank of America (the "Second Smart Gourmet PPP Application"). VO requested a $148,000 loan, listing 22 total employees and a monthly payroll of $54,602.

32. VO again represented that the purpose of the loan was to make payments pursuant to the PPP regulations, such as "payroll," "rent/mortgage interest," and "utilities."

33. On or about February 5, 2021, in reliance on VO's statements about the uses to which he would put the PPP loan, Bank of America approved the Second Smart Gourmet PPP Application. That day, Bank of America deposited $148,000 into the Smart Gourmet Account, which before the transaction had a balance of only approximately $7,500.

34. On or about February 9, 2021, VO wired $100,000 from the Smart Gourmet Account to the E-Trade Account.

35. On or about February 11, 2021, VO wired $30,000 from the Smart Gourmet Account to the E-Trade Account.

36. Between on or about February 11, 2021 and February 12, 2021, VO used more than $70,000 from the E-Trade Account to purchase shares in an electric car manufacturer.

### The Indy Publish PPP Application

37. On or about April 22, 2021, VO submitted a PPP application for Indy Publish—a defunct book publishing business in Virginia—to Bank of America (the "Indy Publish PPP Application"). VO requested a $106,673 loan, listing 14 employees and $42,669 in monthly payroll.

38. VO represented that the purpose of the loan was to make payments pursuant to the PPP regulations, such as "payroll," "rent/mortgage interest," and "utilities."

39. VO also represented on the PPP application that he did not own any other business. He did not disclose his ownership of Smart Gourmet.

40. According to the Maryland Secretary of State's website, Indypublish, Inc. was established as a Maryland corporation in December 2000, with VO as its resident agent. The business was listed a "forfeited" in 2002 for having failed to file property returns for the calendar year 2001. Indypublish, Inc. had no further filing history.

41. I have reviewed Bank of America records for the Indy Publish Account for the period January 2019 through May 2021. The Indy Publish Account shows de minimis revenue and financial activity (and no evidence of payroll) during the period leading up to the Indy Publish PPP Application—only approximately $6,200 in deposits and $1,450 in withdrawals.

42. On or about May 12, 2021, in reliance on VO's statements about what Indy Publish would do with the loan proceeds, Bank of America approved the Indy Publish PPP Application. That day, Bank of America deposited $106,673 into the Indy Publish Account, which before the transaction had a balance of only approximately $5,760.

43. On or about May 13, 2021, the day after receiving the Indy Publish PPP funds, VO wired $90,000 from the Indy Publish Account to the E-Trade Account.

44. On or about May 19, 2021, VO transferred $19,000 from the Indy Publish Account to the Smart Gourmet Account.

45. On or about May 20, 2021, VO used more than $2,400 from the E-Trade Account to purchase shares in a gaming company.

*RRF Application*

The Smart Gourmet RRF Application

46. On or about May 3, 2021, VO submitted an RRF application on behalf of Smart Gourmet (the "Smart Gourmet RRF Application"). In support of his application for a $967,531 RRF loan, VO represented that Smart Gourmet had gross receipts of $1,555,671 in 2019.

47. VO certified that he "would use all funds only on eligible uses."

48. On or about May 24, 2021, in reliance on VO's statements, SBA approved the application. That day, SBA wired $967,531 into the Smart Gourmet Account, which before the transaction had a balance of only approximately $8,486.97.

49. Between May 24, 2021, and July 2, 2021, VO made the following wire transfers from the Smart Gourmet Account:

| Approximate Date | Amount | Recipient |
|---|---|---|
| May 25, 2021 | $100,000 | E-Trade Account |
| May 25, 2021 | $49,000 | Robinhood Account |
| May 28, 2021 | $85,000 | E-Trade Account |
| June 1, 2021 | $90,000 | E-Trade Account |
| June 4, 2021 | $98,000 | E-Trade Account |
| June 7, 2021 | $97,000 | E-Trade Account |
| June 9, 2021 | $95,000 | E-Trade Account |
| June 10, 2021 | $99,000 | E-Trade Account |
| June 14, 2021 | $89,000 | E-Trade Account |

| June 23, 2021 | $30,000 | E-Trade Account |
| June 23, 2021 | $25,000 | Robinhood Account |
| July 2, 2021 | $55,000 | E-Trade Account |
| **TOTAL** | **$912,000** | |

50. Between on or about June 1, 2021 and July 2, 2021, VO used the funds in the E-Trade Account to purchase shares of several different companies. For example, between on or about June 1, 2021 and June 16, 2021, VO purchased more than $480,000 worth of shares in a financial services and digital payments company.

*Interview of VO*

51. On December 17, 2021, investigators interviewed VO by telephone. VO stated, in substance and in part, that:

    a. VO operated Smart Gourmet as a food truck business, employing approximately 20 people in and around Boston;

    b. the business had a significant cash payroll that was not reflected in its books and records;

    c. VO had friends and family in Vietnam who loaned him cash to keep his businesses running;

    d. VO maintained accounts in his name at E-Trade on behalf of family friends who live in Vietnam, and he used money he received from the PPP, EIDL, and RFR loans to re-pay his investors through those accounts.

52. My review of records from VO's E-Trade and Robinhood accounts shows primarily trading activity that began following the accounts' receipt of PPP and other pandemic funds. Contrary to VO's statement to investigators, it does not show withdrawal activity consistent with

repayment to others. Rather, the records reflect withdrawals only to the Smart Gourmet and Indy Publish Accounts.

## CONCLUSION

53. Based on the information described above and my training and experience investigating financial frauds, there is probable cause to believe that between in or about April 2020 and in or about July 2021, Vo, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, caused to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, to wit, among others, a $90,000 wire from the Bank of America Indy Publish Account to VO's account at E-Trade, in violation of Title 18, Untied States Code, Section 1343.

Sworn to under the pains and penalties of perjury.

Respectfully submitted,

Christopher Barbadoro
Special Agent
Federal Bureau of Investigation

Sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on July 18, 2022

Hon. Jennifer C. Boal
United States Magistrate Judge

